

05-443

# IN THE SUPREME COURT OF THE STATE OF MONTANA

## 2008 MT 408

STATE OF MONTANA,

       Plaintiff and Appellee,

  v.

BRIAN ROBERT SCHNEIDER,

       Defendant and Appellant.

APPEAL FROM:    District Court of the Eighteenth Judicial District,
In and For the County of Gallatin, Cause No. DC 04-103
Honorable Holly Brown, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

       Peter B. Ohman, Chief Deputy Public Defender; Bozeman, Montana

       For Appellee:

       Hon. Mike McGrath, Montana Attorney General; Helena, Montana

       Martin D. Lambert, Gallatin County Attorney; Bozeman, Montana

Submitted on Briefs:  June 1, 2006

Decided:  December 8, 2008

Filed:

_____
Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1     Appellant Brian Robert Schneider (Schneider) appeals from the order of the Eighteenth Judicial District Court, Gallatin County, denying his motion to suppress incriminating statements he made during a custodial interrogation.  We affirm.

¶2     We consider the following issues on appeal:

¶3     1.   Does admission of Schneider's statements concerning his involvement in a murder, made to law enforcement officers during a custodial interrogation, conducted outside the presence of counsel appointed for Schneider on a different charge, violate Schneider's state constitutional rights?

¶4     2.   Does application of the *Cobb* "offense-specific" test violate Schneider's right to equal protection under state and federal constitutional law?

## FACTUAL AND PROCEDURAL BACKGROUND

¶5     On February 22, 2004, Schneider and his companion, Lee Cowan (Cowan), were stopped and questioned by authorities in Pima County, Arizona, while trying to gain entrance to Mexico.  Thereafter, Cowan confessed to murdering his mother and her boyfriend in Gallatin County, Montana.  Authorities arrested both men.

¶6     At the time of the arrest, Schneider was on probation for felony theft in the Fifth Judicial District Court, Madison County, Montana.  As a condition of Schneider's probation, he was prohibited from leaving Montana without his probation officer's permission.  Schneider had not sought permission to leave Montana before departing for Mexico with Cowan.  As a result, the Madison County Attorney's Office filed a petition

2

to revoke Schneider's deferred sentence on the ground that Schneider had "left his assigned district without the written permission of his supervising officer." An arrest warrant was issued on February 23, 2004, and on that same day, in response to the warrant, Arizona filed an "interim complaint" against Schneider in Pima County Superior Court, charging him with the crime of being a fugitive from justice pursuant to Ariz. Rev. Stat. § 13-3842. Schneider appeared in Pima County Superior Court and was appointed a public defender, Verne Hill (Hill), to represent him. Schneider met with Hill two days later on February 25, 2004.

¶7 The next day, while still in custody in Arizona, law enforcement officers from the Gallatin County Sheriff's Office, the Pima County Sheriff's Office, and the Montana Division of Criminal Investigation interrogated Schneider regarding the Cowan murders. At the time of the interrogation, the officers were uncertain about Schneider's involvement with the murders. The officers initiated the interrogation and did not contact or seek permission to do so from Hill. However, before questioning Schneider, the officers advised Schneider of his *Miranda* rights. Schneider waived those rights both orally and in writing, and did not indicate a desire for the assistance of counsel at any time during the questioning, wherein he made incriminating statements regarding his involvement with the Cowan murders.

¶8 On April 2, 2004, based on the incriminating statements made during the interrogation and in conjunction with other evidence obtained by law enforcement, the State charged Schneider with two counts of accountability for deliberate homicide. On

3

October 6, 2004, Schneider moved to suppress the statements he made during the Arizona interrogation. After briefing and a hearing, the District Court denied Schneider's motion, primarily in reliance on the United States Supreme Court decision of *Texas v. Cobb*, 532 U.S. 162, 121 S. Ct. 1335 (2001). Schneider then pled guilty to the accountability charges, reserving the right to appeal the District Court's order denying his motion to suppress. The court sentenced Schneider to two consecutive 100 year sentences. Schneider appeals the District Court's denial of his motion to suppress.

## STANDARD OF REVIEW

¶9     We review the denial of a motion to suppress to determine if the district court's findings of fact are clearly erroneous, and whether its interpretation and application of the law is correct. *State v. Pierce*, 2005 MT 182, ¶ 12, 328 Mont. 33, ¶ 12, 116 P.3d 817, ¶ 12. Findings of fact are clearly erroneous if they are unsupported by substantial evidence, the court misapprehended the effect of the evidence, or review of the record convinces us that a mistake has been made. *Pierce*, ¶ 12. We review a district court's conclusions of law and interpretations of the constitution *de novo*. *State v. Mizenko*, 2006 MT 11, ¶ 8, 330 Mont. 299, ¶ 8, 127 P.3d 458, ¶ 8.

## DISCUSSION

¶10     **1. Does admission of Schneider's statements concerning his involvement in a murder, made to law enforcement officers during a custodial interrogation, conducted outside the presence of counsel appointed for Schneider on a different charge, violate Schneider's state constitutional rights?**

¶11     Schneider argues that law enforcement officers violated his Article II, Section 24 right to counsel under the Montana Constitution when they interrogated him about the

4

Cowan murders during his Arizona confinement, without informing or seeking the permission of the attorney appointed to represent him on the Arizona fugitive from justice charge. Acknowledging that the United States Supreme Court rejected such a claim in *Cobb*, Schneider "requests this Court . . . provide more protections to the citizens of the State of Montana than that provided by the United States Constitution" by interpreting Article II, Section 24 as more expansive than the corresponding Sixth Amendment to the United States Constitution. Schneider contends that the "offense specific" application of the Sixth Amendment by the United States Supreme Court in *Cobb* to determine when the right to counsel attaches is "problematic" and "fraught with problems," and asks us to apply a "factually related test to issues concerning appointment of counsel" under Article II, Section 24.

¶12 In *Cobb*, Cobb was arrested and charged with burglary. Over a year later, police arrested Cobb based on a tip that he had murdered a woman and her daughter who had been missing since the burglary. During a custodial interrogation, outside the presence of Cobb's counsel for the burglary charge, Cobb confessed to the murders. Cobb sought to suppress his confession as a violation of the Sixth Amendment, arguing that the burglary and the murders were closely factually related such that his Sixth Amendment right, which had attached for the burglary charge, also attached for purposes of the murder investigation, making the interrogation without his counsel unlawful. *Cobb*, 532 U.S. at 165-67, 121 S. Ct. at 1339-40.

5

¶13     The United States Supreme Court, Chief Justice Rehnquist writing, reaffirmed its earlier determination that the Sixth Amendment right to counsel is "offense specific," meaning that it only applies with respect to the charged offense and "it cannot be invoked once for all future prosecutions . . . ." *Cobb*, 532 U.S. at 167, 121 S. Ct. at 1340 (citing *McNeil v. Wis.*, 501 U.S. 171, 175, 111 S. Ct. 2204, 2207 (1991)).    Accordingly, the Court held that statements, which result from a defendant's un-counseled interrogation regarding offenses for which the defendant has *not* been charged, are "admissible notwithstanding the attachment of his Sixth Amendment right to counsel on other charged offenses," and despite the fact that the defendant's counsel for the charged offense may not have been present at, or informed of, the interrogation.  *Cobb*, 532 U.S. at 168, 121 S. Ct. at 1340.  However, the Court also recognized that, while the Sixth Amendment attaches only to charged offenses, "the definition of an 'offense' is not necessarily limited to the four corners of a charging instrument."  *Cobb*, 501 U.S. at 173, 111 S. Ct. at 1343.  Rather, after the Sixth Amendment has attached, it "encompass[es] offenses that, even if not formally charged, would be considered the same offense under the *Blockburger* test."  *Cobb*, 501 U.S. at 173, 111 S. Ct. at 1343.  Thus, to define the term "offense" for purposes of the Sixth Amendment, the Supreme Court applied the definition of that term used in double jeopardy jurisprudence, noting that there was "no constitutional difference between the meaning of the term 'offense' in the contexts of double jeopardy and of the right to counsel."  *Cobb*, 532 U.S. at 173, 121 S. Ct. at 1343; *see also Blockburger v. U.S.*, 284 U.S. 299, 52 S. Ct. 180 (1932).  Therefore, under the

6

Sixth Amendment, "'where the same act or transaction constitutes a violation of two distinct statutory provisions, the test to be applied to determine whether there are two offenses or only one, is whether each provision requires proof of a fact which the other does not.'" *Cobb*, 532 U.S. at 173, 121 S. Ct. at 1343 (quoting *Blockburger*, 284 U.S. at 304, 52 S. Ct. at 182).[1] Justice Breyer, joined by Justices Stevens, Souter, and Ginsburg, dissented from the majority opinion. Lamenting the application of the *Blockburger* test, the dissent supported adoption of a "closely factually related" test sought by Cobb. *Cobb*, 532 U.S. at 186, 121 S. Ct. at 1350. The dissent asserted that the *Cobb* holding would permit the State, by simply charging only one of many possible offenses, to question nearly every person charged without first contacting counsel. *Cobb*, 532 U.S. at 182-83, 121 S. Ct. at 1348-49.

¶14 Schneider urges that we interpret Article II, Section 24 more expansively than the United States Constitution's Sixth Amendment. He premises his argument upon Justice Breyer's dissent in *Cobb*, urging that "[a]doption of the dissent's test in *Cobb* would give effect to the plain language of Montana's Constitution and still preserve law enforcement's right to conduct interrogations in appropriate situations." The State asks that we reject Schneider's argument that a different outcome should result from application of the Montana Constitution. Unfortunately, the State offers little analysis

---

[1] This is generally known as the "*Blockburger*" test, but is also referred to as the "same-elements" test. This is because the true inquiry is "whether each offense contains an *element* not contained in the other[,]" as opposed to a proof of *fact* which the other does not. *U.S. v. Dixon*, 509 U.S. 688, 696, 113 S. Ct. 2849, 2856 (1993) (emphasis added).

7

regarding the possibility that the Montana constitutional right to counsel may not perfectly align with the federal constitutional right.

¶15 Schneider notes correctly that "this Court has refused to march lock step with decisions of the United States Supreme Court." *See Woirhaye v. Mont. Fourth Jud. Dist. Ct.*, 1998 MT 320, ¶ 14, 292 Mont. 185, ¶ 14, 972 P.2d 800, ¶ 14 ("we have refused to 'march lock-step' with the United States Supreme Court's interpretation of corresponding provisions in the federal constitution"). Although we consider federal authority and have concluded that the Montana Constitution provides equivalent protections or analytical frameworks as the United States Constitution in some instances,[2] we nonetheless conduct an independent review to determine the separate and particular intent of the framers of the Montana Constitution. That intent is first to be "determined from the plain meaning of the words used." *Woirhaye*, ¶ 15. Where the meaning cannot be determined entirely from the plain wording, we consider the relevant legislative intent, which in the case of constitutional interpretation is the 1972 Constitutional Convention. *Kottel v. State*, 2002 MT 278, ¶ 9, 312 Mont. 387, ¶ 9, 60 P.3d 403, ¶ 9. We look to relevant precedent that

---

[2] *See e.g. State v. Ariegwe*, 2007 MT 204, ¶ 34, 338 Mont. 442, ¶ 34, 167 P.3d 815, ¶ 34 (relying on *Barker v. Wingo*, 407 U.S. 514, 92 S. Ct. 2182 (1972), as the "most complete standard available to judge speedy trial questions" pursuant to Article II, Section 24 of the Montana Constitution); *State v. Jackson*, 206 Mont. 338, 344, 672 P.2d 255, 258 (1983) (stating that "the Montana constitutional guarantee of the privilege against self-incrimination affords no broader protection to an accused than does the Fifth Amendment and that the opinion of the United States Supreme Court delineates the maximum breadth of the privilege against self-incrimination in Montana") (internal citation omitted); *overruled on other grounds, State v. Johnson*, 221 Mont. 503, 512, 719 P.2d 1248, 1254 (1986)); s*ee also Quigg v. Slaughter*, 2007 MT 76, ¶ 18, 336 Mont. 474, ¶ 18, 154 P.3d 1217, ¶ 18 (explaining that we look "to federal law for guidance" when interpreting the Montana Constitution).

has already interpreted the provision at issue. *Kottel*, ¶ 9. We may also be guided by federal precedent. *Quigg*, ¶ 18.

¶16 Article II, Section 24 of the Montana Constitution is Montana's counterpart to the United States Constitution's Sixth Amendment right to counsel. This section states:

> **Section 24. Rights of the accused.** In all criminal prosecutions the accused shall have the right to appear and defend in person and by counsel; to demand the nature and cause of the accusation; to meet the witnesses against him face to face; to have process to compel the attendance of witnesses in his behalf, and a speedy public trial by an impartial jury of the county or district in which the offense is alleged to have been committed, subject to the right of the state to have a change of venue for any of the causes for which the defendant may obtain the same.

Schneider argues that the right to counsel under this provision should attach earlier in the criminal process than the "offense specific" Sixth Amendment would attach. He urges that this Court "should recognize the right to counsel attached at the time Mr. Schneider was appointed an attorney on February 23, 2004, and from that point forward the State should only have been permitted to interview Mr. Schneider concerning closely factually related matters with his counsel present."

¶17 The plain language of Section 24 does not expressly indicate at what point in time the right to counsel attaches. However, the language does expressly provide, both in the title and within the provision, that the rights to be protected are those belonging to "the accused." Further, the provision enumerates the rights of the accused which are protected, all of which apply within the context of formal "criminal prosecutions," a term used in the provision. *See State v. Reavley*, 2003 MT 298, ¶ 45, 318 Mont. 150, ¶ 45, 79 P.3d 270, ¶ 45 (right to counsel not violated because defendant "was not an 'accused' and

9

there was no 'criminal prosecution'"). These provisions are consistent with the characteristics of the Sixth Amendment right.

¶18 This consistency is reflected in the deliberations on Article II, Section 24 during the 1972 Constitutional Convention, which indicated an intention on the part of the delegates to align Section 24 with the Sixth Amendment. The Bill of Rights Committee unanimously adopted Section 24, explaining that the Committee "felt [that Section 24] was an admirable statement of the fundamental procedural rights of an accused." Montana Constitutional Convention, Committee Proposals, Feb. 23, 1972, p. 641. Delegate James informed the Convention that "this section is basically the same as Article VI in the Bill of Rights in the federal Constitution adopted in 1791." Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, p. 1776. He further explained that Section 24 was the identical provision to Section 16 of the 1889 Constitution and that the Bill of Rights Committee had offered no changes because it "has stood the test of time . . . [and] should be adopted as is." Montana Constitutional Convention, Verbatim Transcript, March 9, 1972, p. 1776. The convention transcripts reveal no dissatisfaction with the Sixth Amendment nor demonstrate any intention on the part of the convention delegates to expand Section 24 beyond the scope and purpose of the Sixth Amendment. Rather, specific comparison to the Sixth Amendment was made in adopting Section 24. Thus, it is particularly appropriate that we look to federal authority interpreting the Sixth Amendment for guidance. *Quigg*, ¶ 18.

10

¶19     The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense." U.S. Const. amend. VI. The Sixth Amendment right to counsel has been held not to attach until adversarial judicial proceedings are commenced by the state and, as it applies only to the charged offense, it is "offense specific." *McNeil*, 501 U.S. at 175, 111 S. Ct. at 2207; *see also U.S. v. Percy*, 250 F.3d 720, 725 (9th Cir. 2001). After the right attaches and has been invoked, police may not question an accused about the crime for which he has been charged without first seeking permission from his appointed counsel. *McNeil*, 501 U.S. at 175, 111 S. Ct. at 2207.

¶20     The United States Supreme Court has noted that the "core purpose" of the right to counsel contained in the Sixth Amendment is to "assure aid at trial . . . ." *U.S. v. Gouveia*, 467 U.S. 180, 188-89, 104 S. Ct. 2292, 2298 (1984). It has explained that the Sixth Amendment right to counsel secures a trial-based right, intended to ensure fairness in the adversarial process by minimizing any inherent advantages which might exist on the side of the state when it prosecutes an average non-law educated defendant. *See Strickland v. Wash.*, 466 U.S. 668, 686, 104 S. Ct. 2052, 2063-64 (1984); *Johnson v. Zerbst*, 304 U.S. 458, 462-63, 58 S. Ct. 1019, 1022 (1938); *Powell v. Ala.*, 287 U.S. 45, 68-69, 53 S. Ct. 55, 64 (1932). The Supreme Court has extended the Sixth Amendment to what it calls "critical pretrial proceedings," including post-charge interrogations, and the Court's rationale for doing so demonstrates that the Sixth Amendment right remains grounded in formal adversarial proceedings. The Court has explained that extension of

11

the Sixth Amendment is necessary where "'the accused [is] confronted, just as at trial, by the procedural system, or by his expert adversary, or by both,' in a situation where the results of the confrontation 'might well settle the accused's fate and reduce the trial itself to a mere formality.'" *Gouveia*, 467 U.S. at 189, 104 S. Ct. at 2298 (alteration in original) (internal citations omitted).

¶21 We have been guided by federal authority in our right to counsel cases. Noting, in *Reavley*, that Montana law regarding when the right to counsel attaches "has not always been consistent," we explained "[h]owever, the standard in Montana is *now clear and consistent with federal law* as enunciated in *Hayes*." *Reavley*, ¶ 40 (emphasis added). *Reavley* explained the *Hayes* analysis of the Sixth Amendment right as follows:

> "The Sixth Amendment right to counsel does not attach until after the initiation of formal charges." *Hayes*, 231 F.3d at 667; *Moran v. Burbine* (1986), 475 U.S. 412, 431, 106 S. Ct. 1135, 1146, 89 L. Ed. 2d 410, 427; *Kirby v. Illinois* (1972), 406 U.S. 682, 688, 92 S. Ct. 1877, 1881, 32 L. Ed. 2d 411, 417; *United States v. Gouveia* (1984), 467 U.S. 180, 185, 104 S. Ct. 2292, 2296, 81 L. Ed. 2d 146, 152. There must be both a "criminal prosecution" and an "accused" in order for the Sixth Amendment right to attach. *Hayes*, 231 F.3d at 669. Adversarial judicial proceedings must be formally initiated. *Hayes*, 231 F.3d at 672 (citations omitted). Being the target of an investigation is not the equivalent to being formally charged with an offense and is insufficient to trigger the right to counsel. *Hayes*, 231 F.3d at 674 (citations omitted). The existence of an attorney-client relationship itself is insufficient to trigger the Sixth Amendment protections. *Hayes*, 231 F.3d at 671 (citation omitted).

*Reavley*, ¶ 39. The *Hayes* Court re-emphasized that there must be both a "criminal prosecution" and an "accused" in order for the Sixth Amendment to attach, and that the existence of an attorney-client relationship is insufficient by itself to trigger the protections of the Sixth Amendment.

12

¶22 In *Reavley*, which Schneider attempts to distinguish, we likewise found the Supreme Court's holding in *Moran v. Burbine*, 475 U.S. 412, 106 S. Ct. 1135 (1986), instructive. Reavley was interviewed by the police regarding two homicides. On the same day as the interview police were notified that Reavley had consulted counsel after leaving the station. The following day, Reavley's former girlfriend, in cooperation with the police, met with Reavley at a local hotel and recorded their conversation, during which Reavley made potentially incriminating statements. Shortly thereafter, Reavley was charged with two counts of murder in the first degree and the State sought to use the statements at trial. In reversing the district court's suppression of this evidence, we quoted with approval the consequences of the offense specific Sixth Amendment right:

> If proceedings have begun, "the government may not deliberately elicit incriminating statements from an accused out of the presence of counsel" and any evidence so elicited will be inadmissible. *Moran*, 475 U.S. at 431, 106 S. Ct. at 1146 . . . . However, if proceedings have not been initiated, evidence obtained in exactly the same manner from the identical suspect would be admissible at trial.

*Reavley*, ¶ 44. Applying *Moran*, we concluded that Reavley's right to counsel was not violated because, despite the fact that Reavley obtained counsel for the potential charges for which he was under investigation, proceedings had not yet been initiated and therefore the right to counsel had not attached at the time he made the incriminating statements. *Reavley*, ¶ 45.

¶23 Consequently, the wording of the text of Section 24, the Convention delegates' expressed intent, and our case law all demonstrate that the right to counsel under the Montana Constitution is a trial-based right which is consistent with the right provided by

13

Sixth Amendment of the United States Constitution. As such, the Montana right applies with respect to an offense when prosecution has been commenced for that offense, "cannot be invoked once for all future prosecutions," and is "offense specific." *McNeil*, 501 U.S. at 175, 111 S. Ct. at 2207. The right also attaches for other "offenses" connected to the original offense under the Sixth Amendment analysis provided by the United States Supreme Court in *Cobb*.

¶24 Schneider argues that we should reject the United States Supreme Court's analysis, specifically its application of the *Blockburger* test, and expand the definition of "offense" by implementing a "factually related" test mirroring Justice Breyer's dissent in *Cobb*, and thus grant him relief. Schneider argues:

> The majority's decision in *Cobb* really ignores the present day realities of the criminal justice system. It allows the prosecutor to sidestep fundamental rights of the poor and incarcerated persons, and almost renders meaningless representation by counsel at one of the critical stages of the proceeding . . . [T]he only workable rule for the question being raised in this case is the factually related test. The reason being because Appellant was questioned about a charge that could not be separated from the crime for which he had already been appointed counsel.

Schneider asserts that Arizona prosecutors charged him with being a fugitive from justice for the sole purpose of securing his detention so that he could be interrogated regarding his role in the Cowan murders. He argues that this technique was used in bad faith and is the primary evil which results from the United States Supreme Court's definition of "offense." Accordingly, Schneider asserts that we should not follow the Supreme Court's lead in defining "offense" for the purposes of Section 24 because law enforcement will

14

engage in "dubious conduct" and "pick and choose when and how to charge a Defendant simply to avoid the protections afforded by Montana's Constitution."

¶25   We note that Schneider's arguments against application of the *Blockburger* test, as just summarized, are policy-grounded.  He asks this Court to adopt the factually related test because of the opportunities for abuse by law enforcement which he sees within the *Blockburger* test, and the corresponding deprivation of constitutional rights which could be occasioned by such abuse.  Policy arguments surrounding this issue were made in *Cobb* and both sides offer such arguments here.

¶26   The *Cobb* Court rejected the policy arguments offered in support of the factually related test.  "Respondent predicts that the offense-specific rule will prove 'disastrous' to suspects' constitutional rights and will 'permit law enforcement officers almost complete and total license to conduct unwanted and uncounseled interrogations.'"  *Cobb*, 532 U.S. at 171, 121 S. Ct. at 1342.  The Court noted that there was "no evidence that such a parade of horribles has occurred" since the Court's earlier decision on this issue in *McNeil*, and that *Cobb* had failed to appreciate two considerations:   that Fifth Amendment protections "against compulsory self-incrimination and to consult with an attorney" continued to protect the rights of individuals during custodial investigations, and that "the Constitution does not negate society's interest in the ability of police to talk to witnesses and suspects, even those who have been charged with other offenses." *Cobb*, 532 U.S. at 171-72, 121 S. Ct. at 1342-43.  The Court explained that police are often unaware of the "sequence and scope of events they are investigating[,]" making a

15

factually related test impracticable because it would deter police from questioning suspects for fear that they would violate the Sixth Amendment guarantees. *Cobb*, 532 U.S. at 173-74, 121 S. Ct. at 1343-44.

¶27 We are not persuaded that Schneider's policy arguments have undermined the responses provided by the United States Supreme Court in rejecting the similar arguments in *Cobb*, or that the potential that law enforcement may act in bad faith necessitates adoption of his factually related test defining "offense" for purposes of Section 24. Like Cobb, Schneider has offered no evidence to support his contentions. Further, similar to Cobb's arguments, Schneider's arguments fail to acknowledge that officers cannot validly interrogate a defendant in a custodial setting without first warning him or her of the right to counsel contained in the Fifth Amendment and Section 25. Whether counsel is present or not, a defendant must waive his Fifth Amendment and Section 25 rights before his statements may be validly obtained. This is exactly what happened here. Schneider waived, both orally and in writing, his Fifth Amendment and Section 25 rights prior to the interrogation, and at no later time did he assert his right to remain silent or have an attorney present. Neither has Schneider challenged the validity of his waiver of his *Miranda* rights. "We ought to question the wisdom of a judge-made preventative rule to protect a suspect's desire not to speak when it cannot be shown that he had that intent." *Cobb*, 532 U.S. at 176, 121 S. Ct. at 1345 (Kennedy, J., concurring). Schneider clearly intended and voluntarily chose to talk to law enforcement.

16

¶28 Having disposed of Schneider's above-referenced arguments, we decline to analyze his proposed factually related test further. Schneider offers additional argument which relies upon our application of Section 24 in *State v. Johnson*, 221 Mont. 503, 719 P.2d 1248 (1986). However, we overruled *Johnson* on this point in *State v. Buck*, 2006 MT 81, ¶ 47, 331 Mont. 517, ¶ 47, 134 P.3d 53, ¶ 47, wherein we explained that *Johnson* incorrectly relied upon Section 24 as a basis for its holding, and should have relied upon Section 25. *Buck*, ¶ 47. Thus, *Johnson* cannot support Schneider's Section 24 arguments in favor of adoption of a factually related test. Whether there are additional legal arguments which would require adoption of an alternative definition of "offense" for purposes of Section 24 must therefore wait for another day.

¶29 As a secondary matter Schneider asserts that, regardless of our resolution of the above issues, certain statements he made during the murder interrogation concerned the Arizona fugitive from justice charge, and should be suppressed under either the Sixth Amendment or "same transaction" test as defined by statute and applied in our double jeopardy cases. Schneider argues that these answers "must be suppressed because they contained proof to support the charge for which he had been appointed counsel." However, this argument is not relevant to this proceeding. While Schneider may seek to suppress statements related to the Arizona criminal proceeding, that case is not before us and his Sixth Amendment and "same transaction" arguments regarding those statements have no effect on our disposition of the issues herein.

¶30 **2. Does application of the *Cobb* "offense-specific" test violate Schneider's right to equal protection under state and federal constitutional law?**

¶31 Schneider argues that the offense specific nature of the Sixth Amendment and Article II, Section 24 right to counsel violates his right to equal protection guaranteed by the Fourteenth Amendment of the United States Constitution and Article II, Section 4 of the Montana Constitution. In other words, he argues that the way in which the United States Supreme Court and this Court have interpreted the Sixth Amendment and Article II, Section 24, respectively, violates his right to equal protection.

¶32 The Fourteenth Amendment and Article II, Section 4 of the Montana Constitution "embody a fundamental principle of fairness: that the law must treat similarly-situated individuals in a similar manner." *McDermott v. Mont. Dep't of Corr.*, 2001 MT 134, ¶ 30, 305 Mont. 462, ¶ 30, 29 P.3d 992 ¶ 30. When bringing a claim under the Equal Protection Clause, one must show "intentional discrimination against him because of membership in a particular class, not merely that he was treated unfairly as an individual." *Losleben v. Oppedahl*, 2004 MT 5, ¶ 17, 319 Mont. 269, ¶ 17, 83 P.3d 1271, ¶ 17.

¶33 Here, Schneider fails to establish the threshold requirements of an equal protection claim. He neither defines a protected class to which he belongs nor demonstrates that two similarly situated classes are being treated differently. The "scenarios" offered to show potential disparate treatment are not supported by authority demonstrating application of equal protection principles in these contexts. True, some people may enjoy the right to counsel under the Sixth Amendment and Article II, Section 24, while others may not. However, neither this Court nor the United States Supreme Court violates equal

18

protection when defining the contours of the right to counsel. Application of the Sixth Amendment and Article II, Section 24 to certain persons does not create classifications subject to the equal protection clause of the Fourteenth Amendment or Article II, Section 4 of the Montana Constitution.

¶34 The District Court did not err in denying Schneider's motion to suppress his statements. Affirmed.

/S/ JIM RICE

We concur:

/S/ KARLA M. GRAY
/S/ PATRICIA COTTER
/S/ JOHN WARNER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS

Justice James C. Nelson, specially concurring.

¶35 I concur in the Court's conclusion under Issue 2 that Schneider has not established a plausible equal protection claim. As to Issue 1, however, I would dispose of Schneider's right to counsel claim based on an application of *Texas v. Cobb*, 532 U.S. 162, 121 S. Ct. 1335 (2001), to facts of this case. I would affirm on that basis and go no further into the right to counsel issue.

19

¶36 Specifically, I would not address the applicability of Article II, Section 24. For one thing, even if we were to accept Schneider's proposed "closely factually related" test for purposes of analysis under Article II, Section 24, it is quite a stretch to conclude, as Schneider asserts, that the charge of fugitive from justice filed by Arizona authorities is "closely factually related" to the investigation by Montana authorities into Schneider's role in the deaths of Cowan's mother and boyfriend in Montana. It is unnecessary for us to consider whether or not to adopt a test proposed by the appellant for use under the Montana Constitution when the appellant has not even demonstrated that he is entitled to relief under that test if we were to adopt it—as is the case here. Accordingly, "based on the long-standing principle . . . that courts should avoid constitutional issues wherever possible," *State v. Carlson*, 2000 MT 320, ¶ 17, 302 Mont. 508, ¶ 17, 15 P.3d 893, ¶ 17; *accord Wolfe v. Dept. of Labor and Industry*, 255 Mont. 336, 339, 843 P.2d 338, 340 (1992); *State v. Still*, 273 Mont. 261, 263, 902 P.2d 546, 548 (1995), I would not reach Schneider's Article II, Section 24 theory.

¶37 Aside from the fact that it is unnecessary for us to interpret and apply Article II, Section 24 in this case—given Schneider's inability to prevail under his proposed "closely factually related" test—Schneider's argument in this connection is too undeveloped to undertake a distinctive application of state constitutional principles. He refers to Article II, Section 24 and Montana's Constitution several times in his brief; however, he does not offer a cogent analysis of the right to counsel issue on independent state constitutional grounds. Likewise, as the Court correctly observes, the State

20

"[u]nfortunately . . . offers little analysis regarding the possibility that the Montana constitutional right to counsel may not perfectly align with the federal constitutional right." Opinion, ¶ 14. Indeed, the Gallatin County Attorney's brief on appeal mentions Article II, Section 24 only twice, and in passing. There is not even a hint in the State's brief of the analysis that the Court includes at ¶¶ 15-28 of the Opinion.

¶38 Our caselaw in this regard is well-settled. It is not this Court's job to conduct legal research on a party's behalf or to develop legal analysis that may lend support to the party's position. *See Johansen v. Dept. of Natural Resources and Conservation*, 1998 MT 51, ¶ 24, 288 Mont. 39, ¶ 24, 955 P.2d 653, ¶ 24; *In re Marriage of McMahon*, 2002 MT 198, ¶ 6, 311 Mont. 175, ¶ 6, 53 P.3d 1266, ¶ 6; *State v. Zakovi*, 2005 MT 91, ¶ 28, 326 Mont. 475, ¶ 28, 110 P.3d 469, ¶ 28; *State v. Gomez*, 2007 MT 111, ¶ 33, 337 Mont. 219, ¶ 33, 158 P.3d 442, ¶ 33; *State v. Miller*, 2008 MT 106, ¶ 15, 342 Mont. 355, ¶ 15, 181 P.3d 625, ¶ 15. Thus, in *State v. Johnson*, 2005 MT 48, 326 Mont. 161, 108 P.3d 485, we declined to address the defendant's constitutional challenge because we could not "make such a determination on the basis of the abbreviated arguments before us." *Johnson*, ¶ 11. Likewise, in *State v. Garrymore*, 2006 MT 245, 334 Mont. 1, 145 P.3d 946, the defendant asserted—similarly to Schneider's assertion here—that Article II, Sections 24 and 26 of the Montana Constitution afford a greater jury trial right than does the Sixth Amendment to the United States Constitution; yet, critically, he "fail[ed] to offer a compelling reason why the greater jury trial right in Montana dictate[d] a different result in his case." *Garrymore*, ¶ 39. As a result, we found his argument "too

21

undeveloped to undertake a distinctive application of state constitutional principles," and we accordingly did not consider the argument further. *Garrymore*, ¶¶ 38, 39. The identical situation exists here. Schneider's observation that this Court has refused to march lockstep with decisions of the Supreme Court when interpreting Article II, Section 24, is only the first step in an analysis that he and the State both fail to articulate in their briefs. It is injudicious for this Court to render a decision concerning the meaning and substance of a constitutional right based on such plainly inadequate briefing.

¶39 Lastly, as noted, the specific argument underlying the Court's decision in favor of the State was not argued by the State in this appeal. For that matter, it was not addressed by the District Court. Although the District Court referred twice to Article II, Section 24, the court did not analyze this provision. Rather, the court grounded its decision in the Sixth Amendment and *Cobb*. We have stated the principle so often it has become mantra: This Court will not address an issue raised for the first time on appeal. *See e.g. State v. Schaff*, 1998 MT 104, ¶ 26, 288 Mont. 421, ¶ 26, 958 P.2d 682, ¶ 26; *State v. Brown*, 1999 MT 133, ¶ 19, 294 Mont. 509, ¶ 19, 982 P.2d 468, ¶ 19; *State v. Adgerson*, 2003 MT 284, ¶ 12, 318 Mont. 22, ¶ 12, 78 P.3d 850, ¶ 12; *State v. Vaughn*, 2007 MT 164, ¶ 44, 338 Mont. 97, ¶ 44, 164 P.3d 873, ¶ 44; *State v. LaFreniere*, 2008 MT 99, ¶ 11, 342 Mont. 309, ¶ 11, 180 P.3d 1161, ¶ 11.

¶40 Despite these well-settled rules, the Court constructs a far-reaching Opinion which effectively limits the reach of Article II, Section 24's Right to Counsel Clause to the "offense specific" interpretation placed on the Sixth Amendment by the Supreme Court

22

in *Cobb*. However well-reasoned the Court's approach may appear to be, we simply do not need to reach this issue. We ought not to render, sua sponte, a decision which severely cabins a fundamental right under the Montana Constitution where the appellant has not demonstrated he is entitled to relief under the test he proffers and where the parties have not adequately briefed the issue in the trial court and this Court. *Cf. Garrymore*, ¶ 15 n. 3 ("We have decided a number of cases addressing or touching on the meaning of an 'illegal' sentence for purposes of the *Lenihan* rule . . . but have not fully addressed the contours of the term. Further development of this issue, and reconciliation of inconsistencies in these and other cases, may be necessary. *However, neither of the parties has cited to any of these cases or offered such argument, and we thus deem it inappropriate to undertake such issues until they have been properly raised and briefed.*" (emphasis added)).

¶41 Whether viewed from the perspective of the defendant or the prosecution, we have, with no necessary purpose, constructed an interpretation of Article II, Section 24 from whole cloth. We are doing the work that counsel should have done. In sum, we should not address Schneider's Article II, Section 24 theory. Doing so is contrary to M. R. App. P. 12(1)f. and (2) and our well-settled jurisprudence discussed above.

¶42 In closing, I add the following observation concerning the Court's equating of the right to counsel under Article II, Section 24 with the right to counsel under the Sixth Amendment. *See* Opinion, ¶ 23. I see no continued utility to the *Blockburger* test. Montana has adopted its own definitions of "included offense," *see* § 46-1-202(9), MCA,

23

and "same transaction," *see* § 46-1-202(23), MCA, and its own blackletter law governing prosecutions based on the same transaction, *see* § 46-11-503, MCA. Unless one or more of these statutes is held to be in violation of the federal constitution, we should be applying Montana's law in Montana cases to the exclusion of federal precedents that do not align with the statutes our Legislature has adopted.

¶43   For these reasons, I specially concur.


/S/ JAMES C. NELSON